IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

DANIEL HOLT,

      Plaintiff,

v.                                                                  Case No. 21-4039-JWB

FOOT LOCKER RETAIL, INC.,

      Defendant.

**MEMORANDUM AND ORDER**

      Defendant Foot Locker Retail, Inc. moved for summary judgment.  (Doc. 53.)  The motion is fully briefed and ripe for decision.  (Docs. 57, 58, 61.)  For the reasons that follow, Defendant's motion for summary judgment (Doc. 53) is GRANTED.  Defendant's second motion for judgment on the pleadings (Doc. 39) is DENIED as moot.

**I.      Facts and Procedural History**

      The following statement of facts is taken from the parties' submissions.  Factual disputes about immaterial matters are not relevant to the determination before the court.  Therefore, immaterial facts and factual averments that are not supported by record citations are omitted.

      Defendant operates a distribution center in Junction City ("Junction City Distribution Center" or "JCDC").  The Junction City Distribution Center serves all the Foot Locker stores on the East Coast and online customers.  Plaintiff was the Senior Director of Operations for the JCDC at the time of his termination.  Plaintiff's role made him the most senior Operations employee at JCDC, with responsibility for approximately 600 to 700 employees.  Although Plaintiff is not an accountant, he is familiar with generally accepted accounting principles ("GAAP") and in his role, had a lot of responsibility over the warehouse inventory at JCDC.  Most recently, Plaintiff's

immediate supervisors were Todd Greener (Senior Vice President of Supply Chain) and Rebecca Powers (Vice President of North America Distributions).  (Doc. 54, at 2; Doc. 57, at iii; Doc. 58-3, at 3.)

On a few occasions, Plaintiff expressed concerns about inventory requests he and his team received from others within the company.  On August 19, 2015, Plaintiff received a request from a manager in the Transportation department to not receive a shipment into inventory because it had not been approved for delivery.  Plaintiff rejected the request, and the shipment was received into inventory according to standard operation procedures.  No inventory irregularities occurred.  Plaintiff did not recall receiving any pushback after he denied the request and was not reprimanded.  (Doc. 54, at 3; Doc. 57 at iii–iv.)

Plaintiff first informed others of the perceived inventory irregularities in September 2018 in a response to an entity control level survey sent by the Director of Internal Controls.   In Plaintiff's survey response, he addressed concerns with inventory practices along with disagreements with benefits, policies and procedures related to Defendant's 401(k) program and the lack of senior leadership presence at the office.  Plaintiff might have also mentioned that he expressed concerns in his survey response to his supervisor at the time, John Matta.  Plaintiff did not know who would see the survey responses.  (Doc. 54, at 3–4; Doc. 57 at iv.)

Later, on December 20, 2019, Plaintiff received a request from the Director of Accounts Payable to receive some product into inventory that had not yet shipped and arrived at JCDC.  Plaintiff denied the request, copying his supervisor, Todd Greener, and noting that "Receiving product before it is in our building would be falsifying our inventory/company records.  We will have no part of it."  (Doc. 54, at 4; Doc. 57, at iv; Doc. 54-5, at 3.)  Plaintiff forwarded this email along to Doug Markham, Human Resources Manager at JCDC, with his description of the events

detailed in and related to what is described in the email string.  In that email to Markham, Plaintiff indicates that Greener was the first person to reply, stating "Thanks Dan.  Let me know if I can assist."  (Doc. 54-5, at 2; Doc. 54, at 4; Doc. 57, at iv.)

Others who were copied on the email thread also replied, as Plaintiff summarizes to Markham.  Danielle Miller forwarded Plaintiff's email to Paul Cox, and he replied, "Lets [sic] not over react!  I will work with .com to see if there is a solution."  (Doc. 54-5, at 3.)  Christina Davis, a retail controller, also replied to Plaintiff's email, explaining that the intent was not to falsify anything, but to see if there was a way to make product available to consumers on time as promised. (Doc. 54-5, at 2.)  Plaintiff felt as if he had a target on his back after this incident.  Ultimately, the product was not received into inventory before it arrived, and no inventory irregularities occurred related to this specific incident.  (Doc. 54, at 4–5; Doc. 57, at iv–v.)

Shortly after this incident, on December 27, 2019, the Operations team received another request not to receive inventory, this time because the product was sent in error.  Plaintiff did not personally receive this request.  Plaintiff contends that a member of his team tried to comply with the request but ended up receiving the product and then shipping it back to the vendor without proper authorization.  This resulted in a financial error with the inventory records.[1]  Although an error occurred, Plaintiff did not recall following up with any member of his team or imposing any discipline.  Plaintiff acknowledged at his deposition that "it is a possibility" that the issue was resolved before the end of the quarter and that if the issue was resolved, to Plaintiff's knowledge, it would not affect the financial statements in any way.  (Doc. 54, at 5; Doc. 57, at v; Doc. 58-1, at 11.)

---

[1] Presumably, steps were taken to correct this error, although it is not clear from the record what was done to correct the mistake.

A few short days later, on January 3, 2020, Plaintiff received a request from the Logistics Planning department to hold certain product which was supposedly defective and not receive it into inventory upon its arrival.  This request was originally sent to the Receiving department; Danielle Miller, Director of Logistics Planning, forwarded it along to Plaintiff and other Senior Directors.  Plaintiff responded to Miller, stating "[a]ny inventory brought into the building will be received.  We can lock the inventory immediately upon receipt to ensure it doesn't go anywhere." (Doc. 58-12, at 2.)  Plaintiff and Miller engaged in a back-and-forth via email about the proper procedure to deal with the product; Miller contended that the product should be received into inventory after the inspection, and Plaintiff argued that the product should be immediately received and the return coordinated with the vendor.  (Doc. 58-12, at 1–2; Doc. 54, at 5–6; Doc. 57, at vi–vii.)

After some conversation, Plaintiff and Miller decided to receive the product into inventory and set it aside for inspection.  Miller stated in her email to Plaintiff: "This is being blown out of proportion & I'm not sure if you are aware or not, but you are coming across as extremely difficult to work with.  I absolutely do not appreciate you implying that I / my team are not following proper protocol/procedures."  (Doc. 58-12, at 1.)  Miller then forwarded that email to Rebecca Powers, who would become Plaintiff's supervisor about four months later.  (*Id.*; Doc. 58-2, at 2.)

No inventory irregularities occurred because of this request.  Plaintiff says he forwarded this email thread to Greener and Markham to express his frustration at dealing with these types of requests.  Plaintiff also discussed this request, and the ones occurring in December 2019, with Markham to assist in the investigation of an anonymous hotline call related to inventory procedures.[2]  (Doc. 54, at 6; Doc. 57, at vii.)

---

[2] Although the anonymous hotline call appears to relay identical concerns to the ones Plaintiff now complains of, Plaintiff does not contend that he made the anonymous hotline call.  (Doc. 58-1, at 4.)

After the COVID-19 pandemic began, JCDC formed a taskforce to implement health and safety measures. In April 2020, Greener communicated expectations for protocols at JCDC, which recommended, but did not require, the wearing of face masks. (Doc. 54, at 8–9; Doc. 57, at viii–ix; Doc. 58-7, at 1.)

Also in April 2020, Plaintiff received a request to unload product and not receive it into inventory until the end of the fiscal quarter. Although there were times where it was appropriate for product to be unloaded but not received into inventory, Plaintiff was uncomfortable with the request. Plaintiff again complained to Greener and Markham that "[t]his is another example of a request that is being sent to my team that violated SOP and makes a false representation of our company's inventory, this time over a quarter end." (Doc. 58-13, at 2.) Greener forwarded the request on to Paul Cox, who supported Plaintiff's opinion. Danielle Miller also replied to the email string to say "that going forward our team will NEVER send a request to hold a receipt." (Doc. 58-13, at 1.) Miller also thanked Plaintiff for catching the issue and bringing it to everyone's attention. No inventory irregularities occurred because of this request. (Doc. 54, at 5–6; Doc. 57, at vii–viii.)

Rebecca Powers, Plaintiff's supervisor at the time of his termination, testified that she had reiterated to the JCDC leaders several times during morning meetings before May 21, 2020 that it was her expectation that the managers and supervisors would lead by example and wear masks. At that time, masks were strongly recommended for employees but were not required. On May 21, 2020, Powers made it clear to Plaintiff that masks were essentially required for leadership, and Plaintiff communicated this to his staff. Plaintiff wore a mask the next day, May 22, 2020, for the first time since the pandemic began. (Doc. 54, at 9–10; Doc. 57, at ix–x.)

On the evening of May 21, 2020, Plaintiff shared a post from a Facebook page which indicated that he believed people who wore masks were "sheep." Plaintiff was Facebook friends with Foot Locker employees, including employees who reported to him. Plaintiff later removed the Facebook post shortly after he posted it. Although Foot Locker knew about the Facebook post, the company did not consider it a violation of its social media policy. (Doc. 54, at 9–11; Doc. 57, at ix–xi; Doc. 58-1, at 13–14; Doc. 58-2, at 8; Doc. 58-3, at 6–7, 11.)

During a daily morning meeting which happened on May 22, 2020, Plaintiff expressed a comment about being required to wear masks. Powers testified that the comment was sarcastic and directed towards her. Powers also believed the actions to be insubordination.[3] (Doc. 54, at 15; Doc. 57, at x; Doc. 54-1, at 5–6.)

Greener and Powers had discussions after this meeting about Plaintiff's employment with Foot Locker and ultimately decided to terminate his employment. Powers and Greener testified that they chose to terminate Plaintiff's employment because he oversaw 600–700 employees at a facility with six billion dollars in revenue in which he undermined leadership's health and safety protocols related to COVID-19. (Doc. 54-1, at 8; Doc. 58-2, at 8; Doc. 58-3, at 3, 6, 10–11.)

On the afternoon of Monday, May 25, 2020, Greener terminated Plaintiff's employment by phone call. Doug Markham was also on the phone call but did not speak during the call. This occurred on Memorial Day while at least some employees, including Plaintiff, were off work. Plaintiff recalled that Greener initially told Plaintiff that Plaintiff had threatened people during the morning meeting on Friday. Plaintiff had trouble recalling many details from the phone call but

---

[3] Plaintiff disputes that the comment was sarcastic and argues he was not insubordinate at the morning meeting, pointing to Jake White's deposition testimony. (Doc. 57, at x.) The record does not support this assertion because that page of White's deposition was not attached to Plaintiff's memorandum in opposition. Accordingly, although this court must construe evidence in the light most favorable to Plaintiff, it cannot consider this fact because it is not supported by the record.

remembered that Greener "changed his story to something else" and "seemed to be searching for a reason" before Greener said that he would stick to the talking points and ended the call.  (Doc. 54-2, at 33.)  Plaintiff did not recall Greener mentioning concerns about Plaintiff's leadership related to COVID-19 protocols and mask wearing.  (*Id.*)

Plaintiff brought this action against Defendant for common law retaliation for whistleblowing in state court on April 29, 2021.  (Doc. 1-1.)  Defendant removed it on June 11, 2021.  (Doc. 1.)  Defendant brought its second motion for judgment on the pleadings on January 24, 2022.  (Doc. 39.)  After some discovery was conducted, Defendant brought its motion for summary judgment on May 20, 2022.  (Doc. 53.)

## II.     Standard of Review

Summary judgment is appropriate if the moving party demonstrates that there is no genuine dispute as to any material fact, and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  A fact is "material" when it is essential to the claim, and the issues of fact are "genuine" if the proffered evidence permits a reasonable jury to decide the issue in either party's favor.  *Haynes v. Level 3 Commc'ns*, 456 F.3d 1215, 1219 (10th Cir. 2006).  The movant bears the initial burden of proof and must show the lack of evidence on an essential element of the claim.  *Thom v. Bristol—Myers Squibb Co*., 353 F.3d 848, 851 (10th Cir. 2004) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)).  The nonmovant must then bring forth specific facts showing a genuine issue for trial.  *Garrison v. Gambro, Inc*., 428 F.3d 933, 935 (10th Cir. 2005).  Conclusory allegations are not sufficient to create a dispute as to an issue of material fact.  *See Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991).  The court views all evidence and reasonable inferences in the light most favorable to the nonmoving party.  *LifeWise Master Funding v. Telebank*, 374 F.3d 917, 927 (10th Cir. 2004).

### III.    Analysis

Defendant argues that Plaintiff cannot establish a prima facie case of retaliatory discharge based on whistleblowing for three reasons: (1) a reasonably prudent person would not conclude that Defendant was violating laws, rules, or regulations relating to public health, safety, and general welfare; (2) Plaintiff did not engage in actionable reporting; and (3) there is no evidence that Plaintiff was terminated in retaliation for the alleged reporting.  (Doc. 54.)  Additionally, Defendant argues that it terminated Plaintiff for legitimate, non-retaliatory reasons and that Plaintiff cannot establish that these reasons were pretext for retaliation.  (*Id.*)  Plaintiff contends that there are genuine disputes of material facts as to the reports and Defendant's reactions to those reports.  (Doc. 57.)  Because the court finds Defendant's first argument determinative, the court does not address the remaining arguments.

A prima facie case of retaliatory discharge based on whistleblowing consists of three elements:

> [(1)] a reasonably prudent person would have concluded the employee's co-worker or employer was engaged in activities in violation of rules, regulations, or the law pertaining to public health, safety, and the general welfare; [(2)] the employer had knowledge of the employee's reporting of such violation prior to discharge of the employee; and [(3)] the employee was discharged in retaliation for making the report.

*Palmer v. Brown*, 242 Kan. 893, 900, 752 P.2d 685, 690 (1988); *Goodman v. Wesley Med. Ctr., L.L.C.*, 276 Kan. 586, 589–90, 78 P.3d 817, 821 (2003).  Additionally, the employee's report must be made in good faith and not out of spite or malice.  *Shaw v. Sw. Kan. Groundwater Mgmt. Dist. Three*, 42 Kan.App.2d 994, 999, 219 P.3d 857, 862 (2009); *Fowler v. Criticare Home Health Servs., Inc.*, 27 Kan.App.2d 869, 876, 10 P.3d 8, 14 (2000).  If the employee makes his prima facie case, "the burden shifts to the employer to present evidence that the employee was terminated for a legitimate reason, at which point the burden shifts back to the employee to provide evidence that

8

the reason given by the employer was pretextual." *Shaw*, 219 P.3d at 862 (citing *Goodman*, 78 P.3d at 821).

Defendant's first attack on Plaintiff's prima facie case is that even if the events related to inventory were violations of law or rule, they were *not* violations of law or rule pertaining to public health, safety, and the general welfare. (Doc. 54.)  Plaintiff argues that by failing to follow GAAP in the receiving or not receiving of product into inventory, Kansas Blue Sky laws and federal SEC regulations were violated or would have been violated. (Doc. 33, at 4–5.)

Specifically, Plaintiff argues that violations of Kansas Blue Sky laws pertain to the general welfare because the Kansas legislature put these statutes in place which "by definition, established that this is in the public interest." (Doc. 57, at 3.)  Plaintiff argues that the federal SEC regulations protect the general welfare because they specifically set out "the form, content, and requirements for financial statement and require[] that financial statements be prepared in accordance with Generally Accepted Accounting Principles." (*Id.* at 4.)

The court presumes that Kansas courts have been intentional with the language in describing this tort.  If Kansas courts intended for *any* violation of rule, regulation, or law to qualify for whistleblower protection, then the courts would not have added the language "pertaining to public health, safety, and the general welfare."  A survey of the case law shows a clear pattern of reporting of serious public health and safety issues. *See, e.g., White v. Gen. Motors Corp.*, 908 F.2d 669, 671–72 (10th Cir. 1990) (report of defective brakes on vehicles manufactured by defendant); *Eckhart v. Ascend Learning, LLC*, 2021 WL 4355661, at *2 (D. Kan. Sept. 24, 2021) (report of theft and misappropriation of corporate funds for personal use); *Mattice v. City of Stafford*, 494 P.3d 887 (Table), 2021 WL 4227730, at *3–*4 (Kan. Ct. App. Sept. 17, 2021) (police department's alleged failure to follow mandatory reporting laws regarding allegations of child sex

abuse); *Shaw*, 219 P.2d at 864 (report of waste of water causing safety hazard); *Moyer v. Allen Freight Lines, Inc.*, 20 Kan. App. 2d 203, 207–208, 885 P.2d 391, 394–95 (1994) (report by truck driver of equipment failures on truck and violations of DOT regulations).

There is also a trend *not* to recognize a viable claim where the alleged violation is a violation of policy rather than a violation of rule, regulation, or law. *Taylor v. Home Depot USA, Inc.*, 506 F. Supp. 2d 504, 520 (D. Kan. 2007) (granting summary judgment for defendant because plaintiff's alleged whistleblowing merely related to a potential violation of store policy regarding manager purchasing leaf blower); *Herman v. Western Fin. Corp.*, 254 Kan. 870, 881–82, 869 P.2d 696, 704–705 (1994) (no violation of rule, regulation, or law where report was related to alleged issues with a loan application).

The court concludes that Kansas courts have not extended the tort for wrongful discharge related to whistleblowing to include reports such as those made by Plaintiff, as explained below. It is not the place of a federal court sitting in diversity to extend such a common law doctrine to a new application.

Defendant points the court to the *Taylor* case, arguing that it is analogous to Plaintiff's claims. *See Taylor*, 506 F. Supp. 2d at 520. Both Taylor and her husband worked at Home Depot. *Id.* at 510. Taylor assisted with an investigation of a manager who purchased a leaf blower at Home Depot, potentially in violation of store policy. *Id.* at 511. Taylor pulled work schedules for managers to assist in that investigation but did not provide a statement or complaint to the investigator. *Id.* The investigator never told Taylor who the subject of the investigation was. *Id.* Taylor guessed who the investigation was about based on a comment made by a Loss Prevention associate, but Taylor was never able to confirm her suspicions. *Id.*

Taylor believed she was retaliated against because she told a manager, Eli Jantz, that she did not want to do personal things for him and because she believed he was friends with Brian Baldry, the manager who she believed was investigated. *Id.* at 511–12. Jantz had previously asked Taylor to watch his kids or take him to pick up his car. *Id.* at 512. Taylor had made several complaints to Jantz and another manager about Baldry and the way he talked to her. *Id.* Baldry once got in Taylor's face and was loud about Taylor utilizing the "open door" policy at Home Depot to make complaints about Baldry. *Id.* at 513. After this interaction, Taylor complained to Jantz, and Jantz spoke to Baldry. *Id.* Baldry never spoke to Taylor in that way again. *Id.*

Taylor was terminated for violating a major work rule. *Id.* at 510. Home Depot believed that she had provided false information about another employee's request to take time off and in favor of her husband's request for time off. *Id.* Jantz had spoken to Taylor on prior occasions "about the perception of favoritism and not favoring her husband or others in her role as scheduler." *Id.* at 511.

Taylor contended that she was terminated in retaliation for refusing to perform personal errands for Jantz and because of her participation in an investigation of management. *Id.* at 516. Home Depot argued that Taylor did not actually report any illegal conduct, the investigation she participated in related to store policy "and not a matter relating to public health, safety or welfare," and that none of the individuals who terminated her knew that she participated in the investigation. *Id.* at 515.

The court rejected Taylor's argument and agreed with Home Depot – Taylor was not a whistleblower because she did not report any violation of rule, regulation, or law pertaining to public health, safety, and the general welfare. *Id.* at 520. The tort did "not extend to merely reporting suspected failures to comply with internal company policies or procedures unrelated to

11

such laws." *Id.* (citing *Aiken v. Bus. & Indus. Health Grp., Inc.*, 886 F. Supp. 1565, 1573 (D. Kan. 1995)).

Like *Taylor*, Plaintiff cannot allege actual laws were violated because in nearly every situation which arose, no actual financial errors occurred. Plaintiff argues that this is because of his intervention. And generally, the court agrees that Plaintiff was the "squeaky wheel" on inventory issues. But by Plaintiff's own admission, on the December 27, 2019, occasion where there was an inventory irregularity, the issue could have been resolved before the end of the quarter which would mean no financial irregularity would have occurred.

Further, these alleged violations reported by Plaintiff look more like violations of policy than violations of law. This case is very similar to *Taylor* where the alleged violation of policy related to a manager purchasing a leaf blower at one of the Home Depot stores. Presumably, if managers violate policy in purchasing product at stores, a financial irregularity or violation of law could occur. But the court determined that a policy violation was not sufficient under Kansas law to support a whistleblowing claim. The same is true here – if there are violations of policy in how inventory is received and recorded, a financial irregularity or violation of law could occur. But that violation of policy (and speculative violation of law) is insufficient to support a claim of whistleblowing.

Neither Plaintiff nor Defendant cited *Love v. Johnson County Parks and Recreation District*, No. 72,050, 1995 WL 18253445, at *8 (Kan. Ct. App. Aug. 18, 1995), an unpublished Kansas Court of Appeals case, but the court finds it instructive. In that case, Love was the finance manager for the Johnson County Parks and Recreation District for about five years. *Id.* at *1. In 1989, he began to have disputes with other employees, which lead to many back-and-forth interoffice memoranda. *Id.* The straw that broke the camel's back was an interoffice memorandum

12

Love drafted which accused his supervisor of taking several hundred thousand dollars of taxpayer

funds and putting them into special accounts which were outside of the budget. *Id.* at *2. Love

made some other accusations and went on to threaten his supervisor, stating that he could resign

graciously and move on or Love would request an independent audit of the books. *Id.* Love's

supervisor terminated his employment after seeing this memorandum, which he saw as misconduct

and insubordination. *Id.*

Love filed suit for wrongful discharge related to whistleblowing and the trial court granted

summary judgment for his employer. *Id.* at *3. The court of appeals affirmed, for several reasons.

*Id.* at *6–*9. In part, the court said this:

> In addition, Love has failed to produce any evidence sufficient to establish the
> elements of a whistle-blowing claim – first, that there was some activity that one
> might reasonably believe arose to a violation of a rule, regulation, or law of public
> health, safety or general welfare. Love alleges, and the evidence presented
> supports, a potential technical violation of budget laws. At most, the
> uncontroverted evidence would support an inference that monies were transferred
> into the wrong type of fund. Nothing in the record supports a conclusion that the
> funds themselves were misused. Nothing indicates the laws involved in any way
> concerned public health or safety. Where the improprieties reported by the
> employer do not relate to violations of rules, regulations, or laws pertaining to
> public health, safety, and the general welfare, the employment-at-will doctrine
> usually continues in full force.

*Id.* at *8.

Plaintiff reported alleged violations of GAAP, SOP, and certain financial laws to higher

management. But a reasonably prudent person would not conclude those were alleged violations

of rule or law pertaining to public health, safety, and the general welfare. As discussed above,

there is sufficient case law to draw conclusions regarding public health and safety. But there is

simply no basis for this court to determine that these alleged violations of financial law are what

Kansas courts intend "general welfare" to mean. And based on the court of appeals decision in

*Love*, the court believes a Kansas court would agree that these were not violations of rule, regulation, or law pertaining to public health, safety, and the general welfare.

Plaintiff points to two cases in different jurisdictions where courts have recognized violations of financial law as sufficient. But Defendant is right – the tort of wrongful or retaliatory discharge sounds in state law, and Missouri and Illinois do not define the tort in the same way Kansas does. In *Dunn v. Enterprise Rent-A-Car Co.*, 170 S.W.3d 1, 6 (Mo. Ct. App. 2005), the court notes several reasons sufficient for a claim of wrongful discharge, including the very broad "acting in a manner public policy would encourage." In *Johnson v. World Color Press, Inc.*, 498 N.E.2d 575, 576 (Ill. App. Ct. 1986), the court explains that the tort "is recognized when an employee is discharged in violation of a clearly mandated public policy." The court goes on to say "public policy concerns what is right and just and what affects the citizens of the State collectively." *Id.* (internal quotation omitted). Kansas law is much narrower. These cases are not persuasive,[4] and Plaintiff's arguments on this point fail.

Because this court finds that Plaintiff failed to meet the first step of his prima facie case, the court need not address the other arguments made by Defendant.

**IV.    Conclusion**

For all of the above reasons, Defendant's motion for summary judgment (Doc. 53) is GRANTED. Defendant's second motion for judgment on the pleadings (Doc. 39) is DENIED as moot.

IT IS SO ORDERED this 29th day of September, 2022.

---

[4] Even if the framework for the tort claims were the same from state to state, the facts of this case are not like the facts in *Dunn* or *Johnson*. Dunn was an accountant and refused to violate GAAP in connection with preparing and filing documents for an initial public offering. *Dunn*, 170 S.W.3d at 4–5. And Dunn was threatened by higher ups, received a warning, was placed on probation, and was eventually fired during the exact time he refused to falsify documents for the initial public offering. *Id.* at 4–6. Johnson was a Senior Vice President and Chief Financial Officer who voiced opposition to certain accounting practices which created over a million dollars in financial discrepancies and inflated the asset valuation of World Color Press, Inc. *Johnson*, 498 N.E.2d at 576–77.

_____s/ John W. Broomes_____
JOHN W. BROOMES
UNITED STATES DISTRICT JUDGE